**George GUERRA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–82–00444–CR.**

Court of Appeals of Texas,
San Antonio.

Jan. 30, 1985.

Martin Underwood, Comstock, for appellant.

Thomas F. Lee, Dist. Atty., Del Rio, for appellee.

Before ESQUIVEL, BUTTS and DIAL, JJ.

BUTTS, Justice.

This is an appeal from a conviction for capital murder, TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon 1974). Trial was in Medina County following a change of venue from Val Verde County subsequent to a mistrial. After finding appellant guilty of capital murder, the jury returned a negative finding to the second special issue submitted at the punishment phase of the trial pursuant to TEX.CODE CRIM.PROC. ANN. art. 37.071(b)(2) (Vernon 1981 and Vernon Supp.1985). The trial court assessed punishment at life imprisonment. We affirm.

In ground of error one appellant contends there is insufficient evidence that the murder occurred in the course of the kidnapping or attempted kidnapping of the victim. (The pertinent allegations of the indictment are set out in ground of error two.) Additionally, appellant argues that the testimony of Leonel Gutierrez, a cellmate of appellant, proves that the murder occurred spontaneously rather than being incident to the kidnapping, and that such

evidence constitutes exculpatory evidence that the State failed to rebut.

The evidence shows that the victim was a 38 year old woman, Stella ("Star") Hamilton, who worked at Blondie's Steakout in Del Rio. David Reed, manager of Blondie's, testified that appellant entered the lounge a few minutes before midnight on July 10, 1981. Reed was sitting with his companion Bob Frazier when the appellant requested that they both leave so that he could "put some moves on Star." Reed and Frazier refused, and the appellant offered to buy them drinks so that they would leave and they again refused. Reed and Frazier finally did leave the lounge about 1:45 A.M. on July 11, 1981; just the victim and the appellant remained. Appellant thanked Reed and Frazier for leaving. At that time, the victim was closing out that evening's receipts and putting them in a small money bag.

Later that same morning Sergeant Burch of the Del Rio Police Department, responding to a telephone call, observed tire tracks, blood and drag marks in some brush in the 300 block of Central Street, which led him to the victim's nude and battered body. The area was cordoned off and a search led to the recovery of the shoes, blouse and pants of the victim and a towel. The officers obtained a plaster cast of the print of tennis shoes found near the body.

Blondie Calderon was the owner of Blondie's. Out of town at the time of the murder, he had instructed the victim, in closing out the day's business, to total out the cash register, take the money home with her, and then bring it to his wife the following morning. When the victim did not do as she had been instructed, Blondie's wife, Dalinda Calderon, went to check the lounge at about 2:30 P.M., accompanied by one of her daughters and her brother-in-law. She found the victim's station wagon outside; the doors to the lounge were locked by both dead bolt and spring locks. Inside the lounge, the lights were on. The money drawers to the juke box and the pool table were open, the key still remaining in the juke box. The cash register was open and turned on. The victim's cigarettes and cigarette lighter were on top of the bar counter. The victim's glasses were found on the floor at the entrance to the back of the bar. Dalinda Calderon testified that the victim habitually took her lighter, cigarettes and glasses with her everywhere. A cloth tie to the victim's blouse was found on the floor of the lounge.

Anthony Arnold, chemist and toxicologist employed by the Texas Department of Public Safety, testified that the tie at the bar was chemically from the same fiber as the blouse at the murder scene and that the fabrics physically resembled each other.

Suspecting robbery at Blondie's, Dalinda Calderon and her brother-in-law immediately called the police. Detectives Small and Salas investigated. Detective Small had viewed the body found at the Central Street location; from a photograph found in the victim's car he was able to identify the body as that of Stella Hamilton.

Continuing his investigation, Small interviewed Reed, the lounge manager, and his companion Frazier and learned that they had last seen the victim alive in the presence of the appellant. Forensic pathologist Dr. Vincent DiMiao of Bexar County autopsied the body the following day (July 12, 1981). On July 14, 1981, appellant was contacted at his home and voluntarily came to the police station where he consented to have his 1970 yellow Plymouth searched. Raul Diaz, an acquaintance of appellant, testified appellant was driving a 1970 Plymouth automobile on the evening of the murder.

Small found a piece of broken fingernail on the floor board under the driver's seat as well as what appeared to be blood. At trial, D.P.S. Chemist Arnold testified that the broken edge of the fingernail matched one of the fingernails taken from the deceased's body during autopsy in a "jigsaw" type match. Joe Ronald Urbanovsky, a forensic chemist with the D.P.S. corrobo-

rated this testimony. Patricia Hulen, a forensic serologist with the D.P.S. testified that both appellant and decedent had type O blood which was consistent with the human blood samples found in the Plymouth.

On July 16, 1981, Guerra, the appellant, was arrested at his grandparent's home at which time the tennis shoes he was wearing were seized. At trial, David Attenberger, special agent with the FBI, testified that prints of the seized tennis shoes were similar to the shoe prints found near the victim's body, but they could not be positively identified. The print of the shoe was also similar to the mark found on the forehead of the victim. When arrested, appellant had scratch marks on his arms and body and his hands were swollen, and bruises appeared between his fingers.

The judge at the examining trial on September 4, 1981, concluded that there was probable cause to hold Guerra for the murder of Stella Hamilton, binding him over to the grand jury. The first trial of appellant ended in a mistrial on March 19, 1982. The court on its own motion transferred venue to Medina County where a second trial, the subject matter of this appeal, began on June 21, 1982.

While in jail, appellant was a cellmate of Leonel Gutierrez who testified at trial as to what appellant told him had transpired between appellant and the victim:

Q: (Mr. Lee) Mr. Gutierrez, you were explaining to us that George Guerra told you about how he went to that lounge where Stella Hamilton worked to get a date with her. Do you remember that?

A: Yes, sir.

Q: What did he tell you after that?

A: Well, he said he just talked to her, that she turned him down and she didn't want to go out with him, so he told her to think about it, that he would wait outside. So, he waited outside and he got tired of waiting, so, he tried to come back in and the door was closed, and he knocked on the door and Stella came up to the door and told her [sic] she wasn't going, *so he grabbed her by the arm and took her by force to the car;* but then she settled down because she wanted to go back and get some cigarettes she had forgotten, sunglasses or something—I can't recall too good—and he told her that he would get her some cigarettes and she finally agreed to go, so that they took off and—(Emphasis added).

MR. UNDERWOOD: Your Honor, we can't hear the witness.

Q: (Mr. Lee) Can you speak up a little, Mr. Gutierrez?

A: Yes, sir. And they just drove up on—I don't remember the names of the streets. He did mention they went in front of the county jail; but at that time he was trying to grab her, you know, touch her legs and that she wanted to get off but they got to a stop or there by Central Street, she wanted to get off.

Q: Is that Central Street, you said?

A: Yes, sir. That's when he pulled her close to him, pulled her by the hairs and he didn't say what kind of object, he just said that he grabbed something under the seat and hit her with some kind of object or stabbed her and drove on Central Street and parked there and just—when he seen she didn't move, he just dragged her out of the car and threw her in some bushes.

This is a circumstantial evidence case. The standard for reviewing the sufficiency of the evidence is the same for either direct or circumstantial evidence cases; namely, an appellate court must examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Crim.App.1983); *Freeman v. State*, 654 S.W.2d 450, 454 (Tex.Crim.App. 1983); *Vanderbilt v. State*, 629 S.W.2d

709, 715–16 (Tex.Crim.App.1981). *See Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979).

 A conviction based upon circumstantial evidence cannot be sustained unless the circumstances exclude every reasonably hypothesis except guilt of the defendant. Proof amounting to no more than a strong suspicion or mere probability of guilt is not sufficient. *E.g., Schershel v. State,* 575 S.W.2d 548, 550 (Tex.Crim.App. 1979); *Bryant v. State,* 574 S.W.2d 109, 111 (Tex.Crim.App.1978). Nevertheless, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Sullivan v. State,* 564 S.W.2d 698, 705 (Tex.Crim.App.1977); *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App.1977); *Herndon v. State,* 543 S.W.2d 109, 121 (Tex.Crim.App.1976). The rules of circumstantial evidence do not require that the circumstances exclude to a moral certainty every hypothesis that the offense may have been committed by another person. The defensive hypothesis must be a reasonable one, consistent with the facts proved and the circumstances, and the premise that the offense may have been committed by another person must not be out of harmony with the evidence. *See e.g., Sullivan v. State, supra; Flores v. State, supra; Jones v. State,* 442 S.W.2d 698, 702 (Tex. Crim.App.1969) *cert. denied,* 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143 (1970). *Vanderbilt v. State, supra* at 716.

Appellant specifically challenges the sufficiency of the evidence to establish that the murder occurred in the course of kidnapping or attempted kidnapping. The elements of kidnapping are that a person: (1) intentionally or knowingly (2) abducts (3) another person. TEX.PENAL CODE ANN. § 20.03(a) (Vernon 1974); *Vanderbilt v. State, supra* at 715.

"Abduct" means to restrain a person with intent to prevent his liberation by:

(A) secreting or holding him in a place where he is not likely to be found; or

(B) using or threatening to use deadly force.

TEX.PENAL CODE ANN. § 20.01(2) (Vernon 1974); *Vanderbilt v. State, supra* at 715.

The following evidence was presented:

Frazier and Reed last saw Stella Hamilton alive at Blondie's. Her body was found one and one-half to two miles away on Central Street. Stella's car was found in Blondie's parking lot with her purse inside. These facts suggest that she was removed from Blondie's by other than voluntary means.

The autopsy report indicated that although Stella died as a result of asphyxiation by manual strangulation, she also received three knife wounds, had a large gaping puncture wound in her neck, was beaten about the head and face, and one of her left toes was partially severed from her foot. This is some evidence of the exercise of deadly force as contemplated by the definition of "abduction" *supra,* even if it occurred after the deceased entered appellant's automobile.

Stella's cigarettes, cigarette lighter and glasses were left at the lounge, which suggests that she may have left hastily and under duress because there was evidence she took these with her wherever she went. Her blouse tie was found on the floor of Blondie's.

Appellant told Gutierrez he took the deceased to his car by force. Blood and a broken fingernail which matched that of the deceased were found in appellant's car, indicating a struggle. The deceased was last seen alone with appellant. Police found scratch marks on appellant's arms and body and noted his swollen hands at the time of his arrest.

 It was not necessary that the proof show a *completed* kidnapping; the proof

could show an *attempted* kidnapping. *See* TEX.PENAL CODE ANN. § 15.01 (Vernon Supp.1985). We find that any rational trier of fact in this case could have determined the evidence was sufficient to show the murder occurred in the course of appellant's *committing or attempting to commit the offense of kidnapping of the deceased.*

Appellant cites *Palafox v. State,* 608 S.W.2d 177 (Tex.Crim.App.1979) for the proposition that appellant's remarks to his cellmate Gutierrez were exculpatory, that a "spontaneous" homicide, not incident to kidnapping was shown. Whereas in *Palafox,* the defendant admitted that he murdered his victim but testified it was not incident to any robbery, and the State failed to prove robbery, in the case at bar, appellant's statement to Gutierrez tends to lend credence to the murder's commission during the course of kidnapping or attempted kidnapping. Although we find no exculpatory remarks made in appellant's statement to Gutierrez such as contemplated in *Palafox, supra* at 179–80, it is our conclusion that the evidence presented above suffices to rebut any statement considered exculpatory which may have been made. *See Thompson v. State,* 621 S.W.2d 624, 629 (Tex.Crim.App.1981). Ground of error one is overruled.

■ In ground of error two appellant asserts there is a fatal variance between the indictment which alleged that the manner and means of death was unknown to the grand jury and the proof offered at trial. Appellant was convicted of the offense alleged in count two of the State's indictment:

And the Grand Jurors aforesaid, upon their oaths aforesaid do further present in and to said court that on or about the 11th day of July, 1981, in said county and state and anterior to the presentment of this indictment, GEORGE GUERRA did then and there intentionally and knowingly murder, kill, and otherwise cause the death of an individual, STELLA HAMILTON, *by asphyxiating the said STELLA HAMILTON by manner and means to the Grand Jury unknown, and the said GEORGE GUERRA did then and there intentionally cause the death of the said STELLA HAMILTON in the course of committing and attempting to commit the offense of kidnapping upon STELLA HAMILTON.* [Emphasis ours.]

Where the indictment charges that the manner and means used in the commission of the murder is unknown, the State must prove that the grand jury used reasonable diligence to ascertain the manner and means of the purported murder. *Jackson v. State,* 516 S.W.2d 167, 172 (Tex.Crim. App.1974); *Gragg v. State,* 152 Tex.Cr.R. 386, 214 S.W.2d 292, 294 (1948); *Clark v. State,* 151 Tex.Cr.R. 383, 208 S.W.2d 637, 638 (1948).

Val Cadena, foreperson of the grand jury, testified:

Q: Do you recall if any evidence was presented to the Grand Jury as to the manner and means [sic] of Stella Hamilton?

A: No.

Q: Do you recall how Stella Hamilton, as it was presented to you in the Grand Jury, was alleged to have died?

A: I believe I saw some pictures of it. She had some bruises around her neck.

Q: Were you ever told by the prosecutors or the investigator or anyone else presenting evidence to the Grand Jury that Stella Hamilton died from asphyxiation?

A: Yes, I think that's what it was.

Q: Were you ever told at that same time during the presentation of evidence to the Grand Jury that Stella Hamilton died as a result of strangulation?

A: No, I don't think so.

Q: But you did hear something as to asphyxiation?

A: Yes, sir.

Q: And that was before you all returned a true Bill of Indictment?

A: Yes, sir; this is true.

Q: Was any evidence presented to the grand Jury as to how the asphyxiation as alleged of Stella Hamilton occurred?

A: No, no evidence whatsoever.

Q: Did the Grand Jury diligently try to find out how Stella Hamilton was asphyxiated?

A: Some of the members of the Grand Jury might have had some questions, but actually there were no answers so we didn't pursue it.

Q: Do you recall whether or not the—if the investigation reports from the Del Rio Police Department were made available as evidence to the Grand Jury when the offense of capital murder was considered?

A: Yes, sir.

Q: Were facts presented as to the asphyxiation of Stella Hamilton?

A: Yes, sir; I believe so.

Q: Do you recall if the Grand Jury had questions relating to the manner and means of asphyxiation of Stella Hamilton for the individuals presenting the evidence to the Grand Jury?

A: Well, we saw some pictures and that's about all we saw, so we figured that's—that must have been—

Q: Was the Grand Jury able to specifically discover the exact manner and means of the alleged strangulation of Stella Hamilton?

A: No.

Dr. Vincent DiMaio forensic pathologist, performed an autopsy on July 12, 1981. In keeping with his report, DiMaio testified at trial it was his opinion that the victim died by asphyxiation due to manual strangulation. DiMaio also testified that had he been subpoenaed, he was available to testify before the grand jury.

■ It is well settled that an indictment for murder should set forth the means, instrument, or weapon used; or if not known that fact must be stated. When the averment of an indictment is that the means causing death was unknown to the grand jury, this is a material allegation, the substance of which must be proven as pleaded. *Garrett v. State,* 682 S.W.2d 301 (Tex.Crim.App.1984). In the *Garrett* case the pathologist who performed the autopsy on the deceased, testified that death was caused by manual strangulation; however, he did not know the exact means through which the strangulation was effected. Dr. DeMaio did not state that he knew how manual strangulation was effected in this case.

■ In the present case the State offered proof in support of the allegation that the manner and means were unknown to the grand jury. When the proof shows that the grand jury used reasonable diligence and could not determine the manner and means used, this is compliance and supports the allegation in the indictment. *Garrett v. State, supra. See also Gragg v. State, supra* at 294. The evidence does not reflect that the grand jurors were wanting in diligence in failing to find the manner and means by appellant in asphyxiating the deceased. *See Corbett v. State,* 493 S.W.2d 940, 953 (Tex.Crim.App.1973). We find there is no variance between the proof and the allegations. The ground of error is overruled.

Appellant's third ground of error is that the trial court erred by not granting his plea of former jeopardy pursuant to TEX. CODE CRIM.PROC.ANN. art. 27.05(3) (Vernon Supp.1966–1984) and not allowing him to present evidence on the special plea to the jury pursuant to art. 27.07 (Vernon 1966). The record reflects that appellant's first trial for this offense ended in a mistrial. After the jury had deliberated over twenty-three hours, they notified the court they were "hopelessly deadlocked." This was the second note sent to the court to

that effect. The trial court polled the jury, and each juror agreed it would be impossible to reach a unanimous verdict. The State and appellant were represented by counsel and the appellant was present in the courtroom when the trial court declared the mistrial. Appellant voiced no objection at that time.

■ Prior to the instant trial appellant filed his special plea of former jeopardy because of improper termination of the first trial. The trial court denied the plea and ruled there was no issue to be presented to the jury on former jeopardy. As stated in *Chvojka v. State*, 582 S.W.2d 828, 830 (Tex.Crim.App.1979), the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense. *See United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). The Texas court further said, "Whether there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether there is a manifest necessity for the mistrial or the ends of justice would otherwise be defeated." *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

■ TEX.CODE CRIM.PROC.ANN. art. 36.31 (Vernon 1981) provides:

> After the cause is submitted to the jury, it may be discharged when it cannot agree and both parties consent to its discharge; or the court may in its discretion discharge it where it has been kept together for such time as to render it altogether improbable that it can agree.

It is not disputed in this case that appellant did not voice an objection when the mistrial was declared. However, he maintains, he did not thereby *consent* to the jury's discharge. While it appears from the record that appellant did acquiesce to the discharge, it is not necessary that we find there was consent. The trial court's exercise of discretion in declaring a mistrial is determined by the amount of time the jury has deliberated considered in light of the nature of the case and the evidence. *Patterson v. State*, 598 S.W.2d 265, 268 (Tex. Crim.App.1980). Given the circumstances, the trial court properly determined there existed "a manifest necessity for the mistrial." There was no abuse of discretion in declaring the mistrial.

We do not agree the first trial was improperly terminated. The trial court did not err in overruling the former jeopardy plea. Further, the court did not err in ruling there was, therefore, no fact issue of former jeopardy to be placed before the jury. The ground of error is overruled.

In ground of error four appellant argues the trial court erred in changing venue of the case on its own motion from Val Verde County to Medina County. TEX.CODE CRIM.PROC.ANN. art. 31.01 (Vernon 1966). In reviewing the action of the trial court we must determine whether the court acted within its authority and, if so, whether the action constituted an abuse of discretion.

After due notice to the State and appellant, the court conducted a venue hearing. Evidence showed the appellant had been previously tried in Val Verde County in the same case, that trial resulting in a mistrial. The trial had received a great deal of publicity in Del Rio and the surrounding area. The chief of police stated he had talked with "close to" 100 people and they had an opinion of the appellant's guilt or lack of it; that "a few" said they did not think he could obtain a fair trial in that county. It was his stated opinion that neither the State nor the appellant could obtain a fair trial in Val Verde County. "Different ones" expressed the opinion to him a fair trial could be had in other places because of the local notoriety. The sheriff stated

he had talked with many people from all across the county and "many people" were opinionated one way or the other. He said this case in that county was "number one" in publicity. He believed it would be impossible for either the State or the appellant to obtain a fair trial in that county. A third witness, a local funeral home director, stated it was "questionable" whether either side could obtain a fair trial there. Appellant's counsel cross-examined each witness vigorously. No further witnesses were presented, although the State introduced many newspaper articles relating to the case.

> Article 31.01 provides in pertinent part:
> Whenever in any case of felony ... the judge presiding shall be satisfied that a trial, alike fair and impartial to the accused and to the State, cannot, from any cause, be had in the county in which the case is pending, he may, upon his own motion, after due notice to accused and the State, and after hearing evidence thereon, order a change of venue ... stating in his order the grounds of such change of venue.

The Court of Criminal Appeals in *Cook v. State*, 667 S.W.2d 520 (Tex.Crim.App.1984) construed the statute and stated it "does not require the court to offer evidence in support of its own motion, but rather merely affords the parties a chance to be heard on the matter. The court is only required to state in its order the grounds for its decision to change venue." *Id.* at 522. Thus, in the instant case the trial court complied with the requirements of the statute. Absent an abuse of discretion, there is no error.

■ At the end of the venue hearing the court stated, "I find a fair trial, alike to the State and to the defense, cannot be had in Val Verde County and accordingly I'm going to change venue." Its order changing venue on its own motion provided, in part:

> And it appearing to the satisfaction of the Court that a trial alike fair and impartial to the accused and to the State cannot be had in Val Verde County, because at a previous trial of this cause ... in February and March, 1982, which resulted in a mistrial .... much publicity was given to such trial in the newspapers and on the radio in the community of Val Verde County, and many residents and potential jurors have formed opinions as to the guilt or innocence of the accused, and the accused is in custody ... unable to make bail, herein, and a new trial should be promptly scheduled which could not be done in Val Verde County because of the extensive publicity given to this cause during its previous trial....

The *Cook* court noted, at 523, that not only is the trial court not required to offer evidence at the venue hearing in support of its motion, it must also be allowed to consider matters learned outside the formal venue hearing in making its determination to change venue. The statute thus affords the court broad powers.

■ In connection with this contention appellant has sought to prove there exists prejudice against Hispanic defendants in Medina County in that only a minimal number of them have been found *not guilty* by a jury in the history of that county. However, the matter of Medina County prejudice against any defendant with a "Latin surname" was raised for the first time in appellant's motion for new trial. Since this last argument was not before the trial court when it changed venue to an adjoining county, we have no need to consider it as timely raised for purpose of appellate review of the trial court's action. We hold the court did not abuse its discretion in changing venue on its own motion and overrule the ground of error.

In ground of error five appellant asserts the trial court should have granted his challenge for cause of two veniremembers. By not so ruling the court forced him to challenge peremptorily the two prospective jurors. This, in turn, resulted in the exhaustion of his peremptory strikes, and he was,

thus compelled to accept an objectionable juror. *See Wolfe v. State*, 142 Tex.Cr.R. 62, 178 S.W.2d 274, 281 (1944) (on motion for rehearing), which stated in part:

... and the doctrine here laid down that in the trial of a criminal case where an accused has been wrongfully deprived of a peremptory challenge by being forced to use such upon a juror who was shown to be subject to a challenge for cause, and such accused has exhausted his peremptory challenges, and a further juror be presented whom he states be objectionable to him, then it will not be necessary for accused to show in what manner such further juror was objectionable to him, nor to show that such juror was an unfair or partial juror ...

*See also* the tests set forth in *Payton v. State*, 572 S.W.2d 677, 680 (Tex.Crim.App. 1978), contrasting the issues of denial of a challenge for cause and exclusion of a qualified venireman. There the court stated:

Then harm may be shown in the denial of challenge for cause by showing exhaustion of the defendant's peremptory challenges, denial of a request for additional peremptory challenges, and the seating of a juror upon whom the defendant would have exercised peremptory challenge. *Hernandez v. State*, 563 S.W.2d 947 (Tex.Crim.App.1978) ...

*Accord White v. State*, 629 S.W.2d 701, 707 (Tex.Crim.App.1981), *cert. denied*, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982). In the present case appellant adhered to the procedure outlined above. Our question becomes whether either or both of the veniremembers were shown to be subject to challenge for cause. If it can be shown that either veniremember Christelles or Moeller was challengeable for cause and that the overruling of such challenge deprived appellant of a peremptory challenge on juror Lorentzson (whom appellant stated he would have struck if the court had granted an additional peremptory strike as requested), this case must be reversed. *Hernandez v. State, supra* at 948.

TEX.CODE CRIM.PROC.ANN. art 35.-16(c)(2) (Vernon 1966) provides that a challenge for cause may be made by the defense for the reason that a juror ...

... has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor.

Relevant excerpts of veniremember Christelles' testimony follow:

Q: Yes. As you sit here right now do you feel like your're kind of on one side or the other? That is, with the prosecution or with the defense?

A: Well, to be honest, I have to say that with the training I've had, I'd have to be on the prosecution's side.

Q: (By Mr. Underwood) So Mr. Christilles, if we get to talking kind of loosely and we ask you to find the guilt or innocence of the defendant, will you remember and adhere to the Court's instructions that what you're really deciding is whether or not the State has proven their case beyond a reasonable doubt?

A: Yes, I'd try to retain that—to see if they did prove it or not. I would keep that in mind.

While initially acknowledging that he would lean toward the prosecution, Christilles then also agreed to follow the court's instructions.

\* \* \* \* \* \*

Q: (By the State) ... my question to you, because of your background and training, are you going to view those facts in a distorted way against the defendant?

A: No, I wouldn't view those facts in a distorted way against the defendant.

Q: So is there any reason in your mind that you feel that you would be biased or prejudiced against the de-

fendant either for or against the defendant?

A: No, I don't think I would be.

&ast; &ast; &ast; &ast; &ast; &ast;

Christelles, a young man who had studied a law enforcement course at junior college in the recent past, stated to the defense questions that, "I would have to wait and see the evidence before I could decide about this case." He agreed that the appellant would "start off even," that is, he would not be considered guilty because of the indictment. Further, he could return a not guilty verdict if he had a reasonable doubt of appellant's guilt. He said he would rather "let some guilty person free than jail an innocent man."

It is not argued here that bias or prejudice was established as a matter of law. *Anderson v. State,* 633 S.W.2d 851, 854 (Tex.Crim.App.1982). *See also Evert v. State,* 561 S.W.2d 489 (Tex.Crim.App.1978). The *Anderson* court stated that bias exists as a matter of law when a prospective juror admits he is biased for or against a defendant. The same would be true as to a law upon which the defense relies. It is left to the trial court to determine whether or not bias or prejudice exists. We find statements made by Christelles sufficiently support the trial court's implicit finding that he was not disqualified for bias or prejudice against any of the law applicable to the case. Further, there was no showing of bias or prejudice against the appellant himself. TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(9). The trial court did not abuse its discretion in denying the challenge for cause. Part of prospective juror Moeller's testimony in *voir dire* follows:

Q: If the defendant—the defendant under our system of law has the privilege of either testifying in his own behalf or not testifying in his own behalf. He can make that decision. Now, let's deal with the possibility first that he testifies in his own behalf and he takes the witness stand and he wants to tell his side of the story. If that defendant took the stand and testified in his own behalf, is there any reason that you would have to give his testimony greater weight and credibility simply because he's the defendant?

A: I don't think a—I think a lot of that would depend on the circumstances preceding his testimony.

Q: Is there any reason that you would give him less credibility just because he's a defendant?

A: No.

Q: Okay.

A: Well, wait a minute. That's not exactly a true statement on my part. I would probably—on the defendant I would probably scrutinize his—him and his testimony very, very close [sic] just for the simple fact that, you know, to put it very plain [sic], he's got his hide on the line.

Q: Okay.

A: I'm not saying I wouldn't believe what the man says. I'm just going to watch what he does say and compare that to what other testimony has been given.

Q: But you wouldn't automatically say I'm not going to believe this guy?

A: Oh, no. I mean, you can't do that.

Q: And you wouldn't automatically say well, I'm going to believe him more than I would anybody else because he's got the most to gain or to lose?

A: No.

Q: So in other words, he'd start off even then and you would simply do your job as a juror and listen to what he has to say, and as you say, scrutinize what he has to say to determine whether he's telling you the truth or not, is that correct?

A: I'd do my best, yes, sir.

Q: And would you do the same concerning the police officer, listen to his

testimony and scrutinize it to determine whether that officer is telling you the truth?

A: Yes, sir.

Q: If the defendant decided that he did not want to testify in his own behalf, and again, as I said, that's a privilege that he has under our law, and our law further states that you can't hold that against him. In other words, you can go in the jury room and say this fellow must really be guilty or otherwise he would have taken the stand and told us his side of the story. You can't say that to yourself or any other person in the jury room. It's the attitude I'm talking about. You can't hold that against him. Is there any reason that you might have a tendency to hold it against the defendant if he did not take the stand and testify in his own behalf?

A: Right now, all other things being equal, I would probably—I would have to tell you yes, I would probably take that into consideration. It would be a subconscious consideration, whether I want it to be or not. I can tell you that.

Q: Okay. Could you follow the law, is what I'm really asking you, whether or not it's subconscious or not. I'm talking about really your conscious consideration. If the law says you cannot take that against the defendant, would you then disregard the law and say to yourself, well, I tell you, that makes a whole lot more difference to me than anything else?

A: Well, you know, to sit here and tell you you're going to break the law, that's one thing, but in a real world, Mr. Lee, how do you get that out? You know, it's just like if something is said in this courtroom and the judge says the jury will disregard that, you tell me how you're going to disregard it after that piece of evidence has already been put in.

Q: Okay. *Could you make a conscious effort to follow the instructions of the Court?*

A: Yes, that I will do. [Emphasis added].

Initially then, Moeller acknowledged some slight bias toward the prosecution and against appellant, but subsequently the prospective juror said that he would scrutinize testimony from both the perspective of the appellant and the prosecution and make a conscious effort to follow the law.

■ On examining the record, we find no basis for appellant's contention that these jurors were subject to challenge for cause. *Von Byrd v. State*, 569 S.W.2d 883, 893 (Tex.Crim.App.1978). It is sufficient that veniremembers Moeller and Christilles agreed to lay aside their initial impressions and biases and render a verdict based on the evidence presented in court. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

We therefore find that appellant was not incorrectly deprived of two peremptory challenges because neither veniremember was subject to a challenge for cause. *Murphy v. Florida, supra; Wolfe v. State, supra.* Appellant was therefore not entitled to an additional peremptory challenge for juror Lorentzson. *Murphy v. Florida, supra; Barefoot v. State*, 596 S.W.2d 875, 886 (Tex.Crim.App.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Von Byrd v. State, supra; Wolfe v. State, supra.*

■ In his sixth ground of error appellant claims the magistrate erred by denying him the opportunity to present evidence at the examining trial. TEX.CODE CRIM.PROC.ANN. arts. 16.01 *et seq.* (Vernon 1977) provide for an examining trial in felony cases in Texas. The defendant may request the hearing. The purpose of the hearing before a magistrate is to examine into the truth of the accusation made. It is the State's burden to establish probable

▮▮▮▮▮▮▮▮▮▮▮

cause to bind over the defendant to the grand jury for purpose of the return of an indictment against him. If probable cause is not shown, the magistrate may discharge the defendant. TEX.CODE CRIM.PROC. ANN. art. 16.17 (Vernon 1977). However, failure to provide an examining trial does not affect the validity of an indictment. *Trussell v. State*, 414 S.W.2d 466, 467 (Tex. Crim.App.1967). And even if an examining trial is pending when the indictment is returned, the return of the indictment terminates the right to an examining trial. *Brown v. State*, 475 S.W.2d 938, 946 (Tex. Crim.App.1971); *Murphy v. State*, 424 S.W.2d 231, 232 (Tex.Crim.App.1968).

In the present case an examining trial was conducted. Appellant caused to be issued subpoenas for three police officers. The magistrate granted the State's motion to quash the defense subpoenas. Although the court quashed the subpoenas, the court stated, "You can present anyone that you have or anyone that is here." After the State presented two witnesses, the defense noted that it wished to call "on the issue of probable cause" one of the officers who was present who "might have had some knowledge of the facts that have not been gone into ..." Counsel requested the court to attach the witness. (The officer had been present earlier but had gone.) His argument was that probable cause had not been shown and that the appellant had not been connected to the scene where the body was found. The magistrate ruled that probable cause had been shown to bind appellant over to the grand jury. Appellant's argument on appeal is not directed to a failure by the State to sustain its burden of proving probable cause. Under our law this argument would be without merit since the grand jury indictment later provided the requisite probable cause.

▮▮ We note the magistrate did not deny appellant's request for the witness' testimony; he simply did not attach the witness after hearing appellant's argument pertaining to probable cause. Given the

prevailing law as to examining trials and the lack of a viable complaint regarding failure to furnish an examining trial before indictment, we must find that setting aside a conviction because of the occurrences set out above would be incongruous. But we do state that a defendant should be permitted by magistrates to present evidence within reason at his examining trial. Few defendants will wish to disclose defense measures, however. In so stating we do not hold that this magistrate withheld from appellant any right to present evidence contradictory to that which had been presented by the State. The ground of error is overruled.

The judgment is affirmed.